## SENECA NATION *v.* CHRISTY.

ERROR TO THE SUPREME COURT OF THE STATE OF NEW YORK.

No. 180. Argued March 26, 1896. — Decided April 18, 1896.

On the 31st day of August, 1826, the Seneca Nation by treaty and conveyance conveyed away the lands sued for in this action for a valuable consideration, the receipt of which was acknowledged, but the treaty was not ratified by the Senate or proclaimed by the President. On the 13th of October, 1885, this action was commenced in the Supreme Court of New York to recover a portion of the lands so conveyed. It was brought under the provisions of the act of May 8, 1845, c. 150, of the Laws of New York for that year, entitled "An act for the protection and improvement of the Seneca Indians," etc. The trial court gave judgment for defendant, which judgment was sustained by the Court of Appeals of the State on two grounds: (1) that the grant of August, 1826, was a valid transaction, not in contravention of the Constitution of the United States, or of the Indian Intercourse Act of 1802 ; and, (2) that

the right of recovery under the New York Act of 1845 was barred by the statute of limitations. *Held*, that as the judgment could be maintained, upon the second ground, which involved no Federal question, this court, under the well-established rule, must be held to be without jurisdiction, and the writ of error must be dismissed.

THE case is stated in the opinion.

*Mr. James C. Strong* for plaintiff in error.

*Mr. Norris Morey* for defendant in error.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

This was an action of ejectment brought by the Seneca Nation of Indians against Harrison B. Christy in the Supreme Court, Erie County, New York, to recover possession of "all that certain piece or parcel of land situate, lying and being in the town of Brant, county of Erie and State of New York, and known and distinguished as being lot number twenty-five (25) in the tract of land known as being the three thousand eight hundred and forty acre tract taken from the Cattaraugus Indian reservation, as surveyed by James Read, surveyor, and commonly known as the mile strip in the said town of Brant, and containing one hundred acres;" and for damages.

The complaint was verified December 1, 1885, and the answer January 11, 1886. The answer consisted of a general denial; the plea of the statute of limitations of twenty years; and that the plaintiff had not the legal right, title, capacity or authority to maintain the action. The case was tried upon facts stipulated and documentary evidence.

The premises in question were part of a large tract of land in the western part of the State of New York, the title to which was in controversy between the States of New York and Massachusetts prior to the adoption of the Federal Constitution, which controversy was settled by a compact between those States, December 16, 1786. By that compact the State of New York ceded, granted, released and confirmed

to the State of Massachusetts and its grantees, their heirs and assigns forever, the right of preëmption of the soil from the native Indians and all other estate, right, title and property therein belonging to the State of New York, but New York retained the right of government, sovereignty and jurisdiction. Massachusetts was empowered to hold treaties and conferences with the native Indians to extinguish the Indian title; and it was provided that that Commonwealth might grant the right of preëmption of the whole or any part of said lands and territories to any person or persons, who, by virtue of such grant, should have a good right to extinguish by purchase the claims of the native Indians, provided that such purchase should be made in the presence of a superintendent appointed by Massachusetts and be approved by the Commonwealth. This compact was duly ratified by the United States after the adoption of the Federal Constitution.

By a treaty between the Six Nations of Indians, which included the Senecas, and the United States, dated November 11, 1794, at Canandaigua, New York, Timothy Pickering, acting as commissioner on behalf of the United States, (7 Stat. 44,) it was agreed that the lands of the Senecas situated in the western part of the State of New York, described in the treaty, (embracing the land in controversy,) "shall remain theirs until they choose to sell to the people of the United States who have the right to purchase."

Prior to August 31, 1826, all the right of preëmption and title of Massachusetts in a large part of these lands had been conveyed by sundry mesne conveyances to Robert Troup, Thomas L. Ogden and Benjamin W. Rogers. By a treaty and conveyance on that day the Seneca Nation, by its sachems, chiefs and warriors, in the presence of a superintendent on behalf of the State of Massachusetts and a commissioner appointed by the United States, conveyed a tract of eighty-seven thousand acres of the lands, including that in suit, to Troup, Ogden and Rogers, for the consideration of $48,216, acknowledged by the deed to have been in hand and paid. This conveyance was approved and confirmed by the State of Massachusetts, but the treaty was not ratified by

the Senate of the United States or proclaimed by the President.

Soon after the making of said treaty or conveyance, Troup, Ogden and Rogers entered into full and exclusive possession of the lands described therein ; they were divided into parcels, sold and conveyed; extensive and valuable improvements were made thereon.; and for more than fifty years they have been in the possession of the grantees and purchasers under them, claiming title under the grant, and without protest on the part of the United States, the State or the Seneca Nation. Defendant held title from Troup, Ogden and Rogers and their grantees, and at the beginning of this action was in possession, claiming under and by virtue thereof.

In 1827 the sum of $43,050 of the consideration set forth in the conveyance of August 31, 1846, was deposited in the Ontario Bank at Canandaigua, New York, and afterwards, and in the year 1855, that sum was, pursuant to section three of an act of Congress of June 27, 1846, c. 34, 9 Stat. 20, 35, paid into the Treasury of the United States. The interest thereon from 1827 has been annually paid to and received by plaintiff in error.

Plaintiff in error contended that no valid purchase was made by the treaty of August 31, 1826, because that treaty was not formally ratified by the Senate of the United States and proclaimed as such by the President of the United States; and, further, that the purchase was invalid because in contravention of the twelfth section of the act of Congress of March 30, 1802, c. 13, "to regulate trade and intercourse with the Indian tribes." 2 Stat. 139.

This action was brought by the Seneca Nation under an act of the State of New York of May 8, 1845, entitled "An act for the protection and improvement of the Seneca Indians residing on the Cattaraugus and Allegany reservations in this State." Laws New York, 1845, p. 146, c. 150; N. Y. Rev. Stat. (7th ed.) 295. The first section of this act reads as follows :

"§ 1. The Seneca Indians residing on the Allegany and Cattaraugus reservations in this State, shall be deemed to

hold and possess the said reservations as a distinct community, and in and by the name of 'The Seneca Nation of Indians,' may prosecute and maintain in all courts of law and equity in this State, any action, suit or proceeding which may be necessary or proper to protect the rights and interests of the said Indians and of the said nation, in and to the said reservations, and in and to the reservation called the 'oil spring reservation,' and every part thereof, and especially may maintain any action of ejectment to recover the possession of any part of the said reservations unlawfully withheld from them, and any action of trespass or on the case, for any injury to the soil of the said reservations, or for cutting down or removing, or converting any timber or wood growing or being thereon, or any action of replevin for any timber or wood removed therefrom, and may maintain any action or suit as aforesaid, for the recovery of any damage for any injury to the common property or rights of the said Indians, or for the recovery of any sum of money, property or effects, due or to become due, or belonging, or in any way appertaining to the said Indians in common, or to the said Seneca Nation; and where such injury has been heretofore sustained, or any such damages have heretofore been suffered by the Indians in common, or as a nation, actions therefor, and to recover damages for such wrongs may likewise be brought and maintained as herein provided, in the same manner and in the same time, as if brought by citizens of this State in relation to their private individual property and rights; and in every such suit, action or proceeding in relation to lands or real estate, situated within the said reservations, the said Seneca Nation may allege a seisin in fee, and every recovery in such action, shall be as and for, and in reference to a fee; but neither such recovery or anything herein contained shall enlarge or in any way affect the right, title or interest of the said Seneca Nation, or of the said Indians in and to the said reservations, as between them and the grantees or assignees of the preemption right of the said reservations under the grants of the State of Massachusetts. . . ."

The trial court directed a verdict for defendant and ren-

dered judgment thereon, and this judgment was affirmed by the general term on appeal. 49 Hun, 524. The case was carried to the Court of Appeals of New York and the judgment affirmed. 126 N. Y. 122, 147. This writ of error was then brought.

The Court of Appeals considered the case fully on the merits and was of opinion " that the grant of August 31, 1826, was a valid transaction and was not in contravention of the provisions of the Federal Constitution or of the Indian Intercourse Act of 1802, and vested in the purchasers a good title in fee simple absolute to the lands granted, free from any claim of the Seneca Nation ; " and also that, conceding " the invalidity of the grant of August 31, 1826, under the Indian Intercourse Act of 1802, nevertheless the title was subsequently confirmed and made good by the act of Congress of 1846, authorizing the President to receive from the Ontario Bank, and deposit in the Treasury of the United States, the money and securities representing the purchase money of the lands, followed by the transfer of the fund to the United States in 1855." The court further held : " We are also of opinion that as the right of the plaintiff to sue was given by and is dependent upon the statute, chapter 150 of the laws of 1845, (see *Strong* v. *Waterman*, 11 Paige, 607,) the statute of limitations is a bar to the action. By the act of 1845, the actions thereby authorized are to be brought and maintained ' in the same time ' as if brought by citizens of the State. The question is not whether an Indian title can be barred by adverse possession or by state statutes of limitation. The point is that the plaintiff cannot invoke a special remedy given by the statute without being bound by the conditions on which it is given."

In *Strong* v. *Waterman*, 11 Paige, 607, it was held by Chancellor Walworth that the Indians in New York had " an unquestionable right to the use, possession and occupancy of the lands of their respective reservations, which they have not voluntarily ceded to the State, nor granted to individuals by its permission ; and the ultimate fee of such reservations is vested in the State, or in its grantees, subject to such right of use and occupancy, by the Indians, until they shall voluntarily

relinquish the same;" that the right of the Seneca Nation to the use and possession of the Cattaraugus reservation was in all the individuals composing the nation, residing on such reservation in their collective capacity, and that, they having no corporate name, no provision was made by law for bringing an ejectment suit to recover the possession of such lands for their benefit, nor could they maintain an action at law in the name of their tribe to recover damages sustained by them by reason of trespasses committed on their reservations, or to recover compensation for the use of their lands when unlawfully intruded upon, although a bill might be filed by one or more of them in behalf of themselves and other Indians interested to protect their rights and to obtain compensation. And see *Johnson* v. *McIntosh*, 8 Wheat. 573; *Mitchel* v. *United States*, 9 Pet. 711, 745; *Cayuga Nation* v. *New York*, 99 N. Y. 235.

This decision appears to have been rendered May 6, 1845, and on the 8th of May the act was passed, the first section of which has been quoted above.

The proper construction of this enabling act, and the time within which an action might be brought and maintained thereunder, it was the province of the state courts to determine. *DeSaussure* v. *Gaillard*, 127 U. S. 216; *Bausermann* v. *Blunt*, 147 U. S. 647.

The Seneca Nation availed itself of the act in bringing this action, which was subject to the provision, as held by the Court of Appeals, that it could only be brought and maintained " in the same manner and within the same time as if brought by citizens of this State in relation to their private individual property and rights." Under the circumstances, the fact that the plaintiff was an Indian tribe cannot make Federal questions of the correct construction of the act and the bar of the statute of limitations.

As it appears that the decision of the Court of Appeals was rested, in addition to other grounds, upon a distinct and independent ground, not involving any Federal question, and sufficient in itself to maintain the judgment, the writ of error falls within the well settled rule on that subject and cannot be

maintained. *Eustis* v. *Bolles*, 150 U. S. 361; *Gillis* v. *Stinch-field*, 159 U. S. 658.

*Writ of error dismissed.*

MR. JUSTICE HARLAN and MR. JUSTICE BREWER did not hear the argument and took no part in the consideration and decision of this case.